Good morning, Your Honor. May it please the Court, my name is Daniel Snyder. I represent the appellant, estate of Paul Lyche. Your Honor, this is the case in which the Ninth Circuit is asked to rule on the District Court's interpretation of Oregon law on negligence concerning the death of a prisoner who died upon using a sheet in a hanging bar that was placed on the interior of a cell window. The decision of the magistrate judge, or the recommendation of the magistrate judge, was very well reasoned. And as best I can tell, Your Honor, although I have extreme respect for Judge Jones, I tried my first felony case in front of him, I would say that he essentially wanted to reject the law of Oregon on felony casualty in terms of what is reasonably foreseeable. In this case, the plaintiff, or the appellant, actually presented top experts in the field of corrections architecture who discussed the standard of practice and the standard of care, and essentially it makes sense. It is the responsibility of the architect to design, when they're designing a jail, to design a standard jail cell in a way that eliminates all protuberances that an inmate could use to harm themselves on. It doesn't make too much sense. Your expert article, I think, for example, said that you should have vents with, I believe it was 3-8 inch mesh, and yet we know people hang themselves with shoelaces. So even he can't foresee all the magic, wonderful ways that people can decide to hang themselves. And that's the difficulty. You're saying the architect must do it, and not only must they do it, they must do it for all time in the future. For 20 years from now, if somebody hangs himself in the jail, the architects are responsible, I think, is your argument. What I'm saying, Your Honor, is that we've never argued in this case that the architect must make a suicide-proof jail cell, but there are certain recognized hazards in these cells. And in particular, since 95% of suicides in jail cells are done by hanging, this architecture or these architecture firms effectively recognize that. When they place the bar in the interior of the window, which in itself was a suspect practice, they recommended a filler material between the bar and the window specifically for that purpose. At the request of the client, or Washington County, that filler material was deleted. I don't know. Was it a request, or was it, you know, I mean, the client had the final say. I mean, it's the client's decision, right, not to put it in. Well, I think that they had an obligation to warn their client that this was inadvisable,  Certainly, it's a recognized risk that everyone knows about that individuals will try, if they're incarcerated in jail cells, if they become despondent, if they're mentally ill, which Mr. Lickey was, to attempt to harm themselves. Now, the county placed it in apparently a regular cell, not a cell for somebody who... There were certain cells that were attached to the infirmary that could be used to monitor individuals that the county considered to be a suicide risk. And you think that it's an architect's obligation to foresee that a person in that condition, who should have been recognized to be in that condition and put in, I'll call it a suicide watch cell, would be put in a general holding cell? Well, considering the fact that I believe the evidence in this case is that they only had 10 such cells. Such cells meaning what kind of cells? Observation cells. All right. I believe that that's what the expert record says. All right. Go ahead. They have hundreds of inmates. All right. My client was a pretrial detainee. He was held for months. He had bipolar disorder, my client's son, had bipolar disorder and was borderline mentally retarded. So it's an obligation to the county to keep him under watch, right? And are you saying that the architect should have foreseen that the county wouldn't perform that duty? I think that they had a partnership. They had what? A partnership in the operation of the jail? In the design of the jail. The county asked the architecture firm, ZGF, to provide its expertise in corrections architecture. ZGF then hired a subcontractor, HDR, that has specific expertise in corrections architecture. It would be improper to allow these architects to design general cells, knowing that most prisoners are going to be housed in general cells with known risks in the cells. That's why in designing cells in general, the standard of practice, as shown through our experts, is to try to eliminate all perturbances in which an inmate may hang themselves. In this particular case, there was a purposeful decision to eliminate this safety feature. This, Your Honor, is different, I think, than the sort of situation we might have. Let's say we had an architect design the Holiday Inn. When you say a purposeful decision, again, it's not the architect's decision. It's the county's decision. Well, but the architect approved that decision. They were the experts. The architect doesn't have any choice. If a client says, I don't want that, I'm not going to pay for it. What does the architect do? He's supposed to do it. All right, we'll pay for it? Well, let's assume that the client had said, you know, I know you told us to design this building according to code, but we've decided we don't want that. I mean, the architect would have an obligation to tell the client that what he's doing is wrong and inappropriate and doesn't meet the building code. So, essentially – Well, the code sets special rules, of course. I'm so sorry, Your Honor. I believe Oregon, even in Oregon's negligence law, has a special view of things set by statute, ordinance, codes and such. I do believe that they have some special angle on that. I would probably agree with that, Your Honor. But the point I was trying to make, and I know that this is something you're very concerned about, but this wasn't simply a situation where an architect was coming in and designing a holiday inn and someone hung themselves from the curtain rod. This is an architect who is designing a specific kind of building for a specific population where it is well known in the architecture correction field that these individuals face significant suicide risk because they are mentally ill or despondent. If at all possible, Your Honor, I would like to reserve two minutes of my time. That's fine. Thank you very much. Good morning, and may it please the Court. My name is Cecil Renish Smith, and I represent the defendants' HDR architects. Sitting with me at counsel table is Daniel Reising. He represents co-defendant CGF. I will be arguing for both HDR and CGF. The issue in this case is whether under Oregon law, an architect who has included a design feature in a standard jail cell which has facilitated a prisoner's suicide should be held liable for that suicide. And the plaintiff has tried to extend the bounds of Oregon law to say yes, and the correct answer is no. The limits of liability, even in Oregon, do not extend that far. Well, the magistrate judge here made a recommendation to the district court judge that there was a genuine tribal issue of fact with respect to the foreseeability question. The magistrate believed that the way that the Oregon Supreme Court has discussed and defined foreseeability did sweep the architects into its ambit. I would respectfully submit that the magistrate judge was incorrect in his reading of Oregon law and that Judge Jones, who fairly succinctly stated in his opinion and order that Oregon law simply does not go that far, was correct. Incorrect in what regard? You mean that, what? Well, first of all, it's not incorrect that foreseeability is a test. That part's correct. In Oregon, the test is an issue of what the court has called reasonable foreseeability. Right. Which... So it's just a difference of view between the magistrate judge and Judge Jones as to what's reasonably foreseeable, right? Is that what it amounts to? I would disagree with that assertion. It's more an issue of what reasonable foreseeability means as a legal issue is that... Well, all right. Then tell me how the magistrate judge misconstrued the meaning of that term, the legal meaning of that term. The magistrate judge was looking at foreseeability more in the terms of predictability. Was it predictable that this would happen? And he said that given the expert testimony, there was foreseeability because the architects could have predicted that it would happen. All right. If that's a wrong test, what's the right test? The right test is whether or not, not only could it be predicted that this would happen, but was the plaintiff's harm an actual consequence of the act? In other words, was the conduct, the defendant's act, was that the harm-producing force that led to the plaintiff's harm? And granted, Oregon law is not crystal clear on this issue. In the Fasolari case, the Supreme Court, in an attempt to clarify the law of negligence by getting away from what it saw as hidebound issues of duty and obligation and proximate cause, took off onto this new track of foreseeability. And Judge Jones was part of that, correct? Judge Jones was on that panel. Correct. He's not just any judge. He knows whereupon he speaks when he discusses the effect of Fasolari on Oregon law. He was also on the panel of other Supreme Court cases that followed Fasolari and attempted to clarify it. And that has been an ongoing process in Oregon, with the most recent case being the Oregon Steel Mills against Cooper's case, which drew upon both the Fasolari and Buechler cases to attempt once again to explain how foreseeability, as a way of determining liability, how that actually works. It looks to me like Oregon, there's a kind of maybe a sliding scale of some kind. People say foreseeability. Oregon has tried to collapse it all into some sort of a sliding area. And there's a big area in the center that you always give to the jury. And then you can get too far along the scale. And courts say, no, it doesn't go this far. If it's this kind of situation, it is not, indeed, a negligence problem. What do you want to call it? Duty, foreseeability, like other people might. That's what they say it looks like. It looks like they said if it's just something that facilitated the person doing something, for example, somebody doing something to himself, and it's just facilitation, that goes too far. We're not going to impose it unless there's a statute, et cetera, et cetera. Is that about where it is? I would say that that is a very good explanation of what is going on. The other end of the scale, of course, is you're always going to be responsible if you're dead. And so it's like it looks that way. It's not entirely clear. It's not entirely clear. But that does seem to be what is happening in Oregon, that there are some things that will always be a fact question, but there are some things that are just outside the limits. And if they fall outside the limits, then as a matter of law, they're not reasonably foreseeable. And the Oregon Steel Mills Court, I think, made a valiant attempt to explain what was going on. I think it's still not entirely clear. But the one thing that is very clear from that is there are certain things that just as a matter of law are not reasonably foreseeable, even if they may have been predictable. And this fall, from your perspective, this falls outside the limits. This falls outside the limits. Because of his intentional conduct. The intentional conduct is. Or the lack of causation. It's a combination. And, again, the problem that we have with Oregon law is the court does not want us to talk about proximate cause, legal causation, even though I find it impossible to read, especially the recent cases. But, yes, for those reasons, in fact, it's very difficult to even find a but-for causation in this case, because you would be saying that but for the fact that this bar was there, he would not have committed suicide. And there's no way to prove that one way or another, I don't believe. I don't think that that was something that was part of the evidentiary record. But at the very least, at the most, this could be as a facilitation. He made a conscious decision to kill himself. And of the ways that he could have killed himself, hanging was one. And the bar facilitated that. But there were other ways that he could have hung. There are other ways that he could have killed himself. And there's evidence in the record of ways that prisoners in that cell, that jail, had killed themselves. The other thing to keep in mind, and this is something- In the regular cells? In regular cells. There was the prisoner that garroted himself with his own T-shirt, and the prisoner that killed himself with a sharpened toothbrush are two examples that I recall from the record. Yeah, amazing. It looks like some people can strangle themselves with a towel. Just by pulling on the ends of the towel. I'm amazed. I never thought that could happen, but apparently it can, and they do it. I believe if the will to do it is there, they will find the means. And so the mere fact that the design of the cell was a facilitator, that means you can't say that it was the harm-producing force. It was the intentional act that was the harm-producing force. And another thing to bear in mind, and this is something that came up during Plaintiff's presentation, was the question of whose responsibility is it in the end to prevent this suicide, and what responsibility did the county have? And defendants, HDR and ZGF, had designed special cells for inmates who were potential suicide risks. And one of the positions that Plaintiff took at trial, and a factual admission that Plaintiff made in response to interrogatories, was that the county was aware that the Plaintiff's decedent was suicidal and mentally ill. And to say that the architects would be able to foresee or predict that the county would fail in its duties is, again, it stretches the limits of liability. In case, unless the Court has any other questions. Thank you. Thank you. There were two crucial steps that these architects did. First was to design a cell with a bar on the inside of the glass or glazing, rather than on the outside. And secondly, to design a filler material between the hanging bar and the glazing, and then deciding to eliminate that glazing material. These architects knew that 95% of prison suicides are by hanging. And they simply just didn't merely facilitate this. They actually created an extreme hazard in this jail cell by doing this. Counsel suggests that Mr. Lickey's own conduct cuts off the architect's liability. This is incorrect under Oregon law. Under Cole v. Multnomah County, which we cited in the brief, the harm that was to be guarded against was inmate suicide. Therefore, it is not an intervening cause. The whole purpose of calling in these architects as corrections architects and experts was to prevent exactly this sort of thing from occurring. Counsel suggests that the magistrate judge, Judge Jeldricks, talked about this case in terms of what is predictable. In fact, respectfully, that is incorrect. He talked about this being reasonably foreseeable, and that appears on page 61 of the record. It well may be that Oregon's own unique analysis of negligence law under Favillari may seem foreign. However, it is the law in Oregon. Clearly, this was reasonably foreseeable, and a mistake was made by the district judge, which the Ninth Circuit should reverse. Thank you very much. Thank you. The matter will be submitted.
judges: Fernandez, Tashima, Paez